UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

COMMODITIES & MINERALS                          19 Civ. 11654 (ALC)
ENTERPRISE, LTD.,

                          Petitioner,

            -against-

CVG FERROMINERA ORINOCO,
C.A.,

                          Respondent.

--------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION

Edward A. Keane
Daniel E. Vielleville
Garth S. Wolfson

        Of Counsel

**MAHONEY & KEANE, LLP**
**Attorneys for Respondent**
**61 Broadway, Suite 905**
**New York, New York 10006**
**(212) 385-1422**
*-and-*

**ASSOULINE & BERLOWE**
**100 SE 2nd St., #3105**
**Miami, Florida 33131**
**(905) 567-5576**

## <u>TABLE OF CONTENTS</u>

*Page*

COUNTER-STATEMENT OF FACTS AND PROCEDURAL HISTORY…………………………1

PRELIMINARY STATEMENT……………………………………………………………………4

ARGUMENT......................................................................................................................................6

POINT I.     THE PANEL LACKED JURISDICTION TO ARBITRATE THIS DISPUTE….…**6**

A.     THE PANEL'S FINDING ON ARBITRABILITY IS SUBJECT TO <u>DE NOVO</u>
       REVIEW BY THIS COURT……………………………………………………………**6**

B.     THE PANEL'S FAILURE TO FULLY CONSIDER AND PROPERLY APPLY
       VENEZUELAN LAW TO THE ISSUE OF UNDERLYING CONTRACT
       FORMATION CONSTITUTED CLEAR ERROR……………………………...**8**

C.     UNDER VENEZUELAN LAW, NO VALID AGREEMENT TO ARBITRATE
       CAN BE RECOGNIZED………………………………………………………**11**

POINT II.    THE PANEL'S FINAL AWARD EXCEEDED THE SCOPE OF THE NEW
             YORK ARBITRATION PROVISION………………………………………………**13**

POINT III.   THE PETITION SHOULD BE DENIED UNDER ARTICLE V(2)(b) OF THE
             NEW YORK COVENTION…………………………………………………**16**

A.     THE COURT SHOULD UNDERTAKE AN INDEPENDENT REVIEW OF THE
       RECORD……………………………………………………………………...**18**

B.     THE COURT SHOULD FIND THAT THE GENERAL PIAR CHARTER
       PARTY WAS PART OF A CONTRACTUAL SCHEME WHICH WAS THE
       PRODUCT OF CORRUPTION…………………………………………...**18**

C.     ENFORCEMENT OF THE ARBITRAL AWARD WOULD BE CONTRARY
       TO UNITED STATES PUBLIC POLICY………………………………**24**

CONCLUSION....................................................................................................................................**28**

## COUNTER STATEMENT OF FACTS AND PROCEDURAL HISTORY

As the Court has succinctly stated, "[COMMODITEIS & MINERALS ENTERPRISE ('CME')] is a company that sells various commodities and minerals, including iron ore. In 2004, it entered into a series of contracts with [CVG FERROMINERA ORINOCO C.A. ('FMO')], a Venezuelan State owned entity that focuses on producing and exporting iron ore. Under the contracts, CME agreed to supply financing, equipment, services to FMO in connection with FMO's iron ore mining and sales operations in Guayana. CME alleges FMO breached several of these contracts, including two maritime contracts. See, Order dated September 18, 2019 in the earlier related action under Case No. 16 Civ. 00861 (ALC) [hereinafter "Related Action"], Docket Entry No. 122, at 1.

These contracts included, inter alia, the so-called Transfer System Management Contract, ("TSMC") the Wagons Contract, the English Charter Parties, and the General Piar Charter, each of which, CME has judicially admitted, contained separate arbitration provisions invoking different fora. See, Complaint in Related Action, Docket Entry No. 1, at ¶¶ 9-11 and 58-81; see also, FMO's Answering Brief on Jurisdiction, Docket Entry No. 21-5. The Miami-based TSMC arbitration was conducted jointly with the New York-based General Piar arbitration, and, accordingly, both arbitrations were addressed concurrently in the Panel's Final Award. See, generally, Final Award, Exhibit 1 to Paulsen Affidavit. However, only so much of the Final Award as concerns the General Piar Charter is now before the Court for review, the TSMC being properly before the United States District Court for Miami for any confirmation and enforcement proceedings. See, e.g., Petition, Docket Entry No. 1, at ¶ 19.

There is also no dispute that, from the inception, FMO has argued that no valid agreement to arbitrate the General Piar Charter was ever formed under Venezuelan law. See, e.g., Petition, Docket Entry No. 1, at ¶ 17. FMO asserted, inter alia, that several compulsorily applicable Venezuelan statutes rendered the arbitration clause null and void given the lack of the required express State authorizations, and that the agreement was procured by fraud and violated public procurement laws. In this regard, the Court is respectfully referred to the three Expert Declarations of Alejandro Canonico, FMO's expert in the arbitration proceedings, together with their supporting materials, filed herewith.

However, the Panel applied the contractual choice-of-law clause to the issue of contract formation and thus found Venezuelan law inapplicable, and, in a somewhat perfunctory fashion, noted that, even if Venezuelan law had applied, FMO' arguments would be rejected. See, Final Award, Exhibit 1 to Paulsen Affidavit, at ¶¶ 319-322.

Moreover, FMO argued, even if the General Piar Charter arbitration provision were to be deemed valid, the subject matter raised in the arbitration would have gone far beyond its limited scope. Hundreds of millions of dollars in goods and services were passed back and forth between the parties in performance of all the contracts in the aggregate, subject only to periodic mass ex post facto overall "reconciliations" without real reference to the actual debts due or paid under each contract. See, Complaint in Related Action, Docket Entry No. 1, at ¶¶ 82-86; CME's Second Amended Statement of Claim, Exhibit A to Keane Declaration, at ¶ 40; see also, FMO's Answering Brief on Jurisdiction, Docket Entry No. 21-5. The parties' invoices were never made referable to any particular contract. Id. And the implications went far beyond mere shoddy

accounting. As a result, CME did not identify payments or offsets attributable to each contract, and, rather, bundled damages accruing on all the contracts (each with separate forum-selection agreements) and crudely prorated them for submission in the General Piar arbitration. Id. CME, concededly, unilaterally decided to attribute FMO's payments and credits to iron ore contracts and commitment unrelated, leaving FMO in purported debt with regard to the General Piar Charter. But, as FMO argued in the initial briefing on jurisdiction before the Panel, FMO has always maintained that its payments should be credited to the General Piar Charter first, leaving no debt owing under the General Piar Charter and thus further divesting the Panel of authority to extend the scope of the General Piar Charter to disputes concerning the full damages claimed by CME. Id.

The Panel readily acknowledged the daunting task of sorting out the damages as a result. See, Final Award, Exhibit 1 to Paulsen Affidavit, at ¶ 363. However, as to FMO's argument that the problem was not just an accounting issue but affected the scope of the Panel's jurisdiction, the Panel found that all the contracts were essentially "intertwined" in a kind of "barter system", effectively melding the contracts and overlooking their separate arbitration provisions, and proceeded to assess the damages based on approximations founded upon past reconciliations. See, Final Award, Exhibit 1 to Paulsen Affidavit, at ¶¶ 366-368.

These issues of arbitrability and scope are thus now before the Court for the first time.

# PRELIMINARY STATEMENT

The Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1333, and the federal maritime law, including its conflicts-of-law analysis, applies. Norfolk S. Ry. Co. v. Kirby, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004); Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 1995 A.M.C. 913 (1995).

This proceeding is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 ("the New York Convention"). The New York Convention is applicable to the courts of the United States pursuant to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 201 et seq. The New York Convention applies to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." N.Y. Convention, art. I(1). "Under Second Circuit precedent, a nondomestic arbitral award is an award that is "made" in the United States because the parties agreed to arbitrate before an arbitrator in the United States, but which nonetheless falls under the New York Convention and Chapter 2 of the FAA for one of two reasons: (1) it was "made within the legal framework of another country, e.g., pronounced in accordance with foreign law[,]" or (2) it was decided under the laws of the United States but involves either entities that are not U.S. citizens or, even if only U.S. citizens are involved, also involves "property located abroad, [or] envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." CBF Indústria de Gusa S/A v. AMCI Holdings, Inc., 850 F.3d 58 (2nd Cir. 2017) (citing Bergesen v. Joseph Muller Corp., 710 F.2d 928, 932 (2d Cir. 1983).

Article V of the New York Convention specifies the grounds under which a court may refuse confirmation of an arbitral award. Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85 (2d Cir. 2005). And, although the United States' pro-arbitration policy is well recognized, it is equally well established that U.S. court must vigorously enforce the narrow but fundamental safeguards specified in Article V of the New York Convention for refusing recognition of arbitral awards, including when recognition would conflict with other U.S. public policies. See New York Convention Art. V(2)(B). The enforcement of these fundamental safeguards ensures that the credibility of the U.S. judiciary is not place behind an arbitral award that offends U.S. public policy, thereby safeguarding both the right of the parties to the arbitration in question and the continuing legitimacy of arbitration as a dispute resolution mechanism. Here, recognition and enforcement of the arbitral award would allow CME to reap the benefits of a contract it obtained through corruption, including of foreign public officials, in violation of fundamental U.S. public policy, see, United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 42 (1987), and recognition should therefore be denied under Article V(2)(b) of the New York Convention.

FMO respectfully submits that CME's motion should be denied on any one of the following bases.[1]

_____

[1] FMO also refers the Court to its prior argument concerning lack of personal jurisdiction, due to FMO's failure to properly accomplish service of process. See, FMO's Response to Order to Show Cause, Docket Entry No. 21, at 5-8.

## ARGUMENT

**POINT I.**     **THE PANEL LACKED JURISDICTION TO ARBITRATE THIS DISPUTE.**

     **A.**     **THE PANEL'S FINDING ON ARBITRABILITY IS SUBJECT TO DE NOVO REVIEW BY THIS COURT.**

Article V(1) of the New York Convention allows the Court to deny recognition where a tribunal acted without jurisdiction. "While federal policy generally favors arbitration, the obligation to arbitrate nevertheless remains a creature of contract," Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 2001 A.M.C. 1939 (2d Cir. 2001); see also, Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 478, 109 S. Ct. 1248 (1989); U.S. Titan Inc. v. Guangzhou Zhen Hua Shipping Co., 241 F.2d 135, 2001 A.M.C. 2080 (2d Cir. 2001); Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) ("A nonsignatory party may be bound to an arbitration agreement if so dictated by ordinary principles of contract and agency."); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n.12, 87 S. Ct. 1801 (1967), with the party alleging the agreement to arbitrate at all times bearing the burden of proof. Fisser v. International Bank, 175 F. Supp. 305, 307, 1959 A.M.C. 1192 (S.D.N.Y. 1958).

Thus, "a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." AT&T Tech's, Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986); see also, Merrill Lynch Investment Managers v. Optibase, Ltd., 337 F.3d 125, 129-30 (2d Cir. 2003); Interocean Shipping Co. v. National Shipping and Trading Corp., 523 F.2d 527, 539 (2d Cir. 1975), cert. denied, 423 U.S. 1054 (1976); Fried. Krupp, GMBH v. Solidarity Carriers, Inc., 674 F. Supp. 1022, 1027 (S.D.N.Y. 1987), aff'd, 838

F.2d 1202 (2d Cir. 1988);  Ahn v. Rooney Packe, Inc., 624 F. Supp. 368, 369 (S.D.N.Y. 1985).

And, under United States law, it is generally for the court, not the arbitrators, to decide the threshold question of whether there is a binding agreement to arbitrate.  See, Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002);  Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26 (2d Cir. 2001);  Interbras Cayman Co. v. Orient Victory Shipping Co., S.A., 663 F.2d 4, 7 (2d Cir. 1981);  Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972);  Almacenes Fernandez, S.A. v. Golodetz, 148 F.2d 625, 628 (2d Cir. 1945).

Parties may specifically agree to have an arbitrator decide not only the merits of a particular dispute but also "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Rent-A-Center West, Inc. v. Jackson, 561 U. S. 63, 68-69 (2010). An "agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." Id. at 70. The Supreme Court has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, only so long as the parties' agreement does so by "clear and unmistakable" evidence. First Options, 514 U. S., at 944; Rent-A-Center, 561 U. S., at 69, n. 1.

In the matter sub judice, the very different wording of the arbitration provision of the TSMC in the consolidated Miami arbitration notwithstanding, the arbitration agreement included in the General Piar Charter plainly did not confer the Panel with the power to resolve issues of arbitrability, nor did the Rules of Arbitration of the Society of

Maritime Arbitrators. See, Exhibit 1 to Paulsen Affidavit, at 54; see also, Bordelon Marine, L.L.C. v. Bibby Subsea ROV, LLC, No. 16-1106, 2016 WL 3655997, * 9-10, (E.D. La. Jul. 7, 2016). Therefore, there was no "clear and unmistakable" evidence that the parties delegated arbitrability questions to the Panel.

And, as the Final Award itself recorded, from the outset, FMO vigorously contested the Panel's jurisdiction on the basis of arbitrability. See, e.g., Exhibit 1 to Paulsen Affidavit, at 22-23.

Nonetheless, the Final Award did not address the issue at all and merely noted, in an entirely conclusory and generalized manner, that "FMO's contentions are without merit. We conclude that we have jurisdiction to hear and decide the claims and counterclaims." Id. It was silent as to the Panel's authority to decide its own jurisdiction and clearly overstepped its mandate.

In any event, however, as a matter of settled law, it now falls to this Court and this Court alone to determine the issue without any special deference to the arbitrators. The Court is tasked to review the Panel's ruling on its own jurisdiction de novo. See, Katz v. Feinberg, 290 F.3d 95, 97 (2d Cir. 2002). Even if the Panel had ruled on the issue, its determination receives no deference; "the court should decide [the] question . . . independently." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995); see also, KenAmerican Res. v. Int'l Union, UMW, 99 F.3d 1161, 1163 (D.C. Cir. 1996) (court may "not afford any deference at all to the arbitrator's view").

**B.     THE PANEL'S FAILURE TO FULLY CONSIDER AND PROPERLY APPLY VENEZUELAN LAW TO THE ISSUE OF UNDERLYING CONTRACT FORMATION CONSTITUTED CLEAR ERROR.**

The Panel here found that "the General Piar Charter calls for the application of US maritime law and we conclude that the claims and counterclaims at issue before us concerning the charter are to be decided pursuant to that law . . . In light of our conclusion that the claims and counterclaims at issue in both arbitrations are governed by US law, we need not discuss the arguments asserted by FMO concerning Venezuelan law, which we hold has no application to these disputes." See, Exhibit 1 to Paulsen Affidavit, at 55-56.

However, the Panel's position was contrary to law. "[The contractual choice-of-law provision] does not determine the law that the Court should apply to determine whether the arbitration clause was part of any agreement between the parties unless and until it is determined that the parties have agreed to and are bound by it. Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012)) (citing, Trans–Tec Asia v. M/V Harmony Container, 518 F.3d 1120, 1124 (9th Cir.2008) ("[W]e cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract."); B–S Steel of Kansas, Inc. v. Texas Indus., Inc., 439 F.3d 653, 661 n. 9 (10th Cir.2006) (referring to "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid"); see also, Kulig v. Midland Funding, LLC, No. 13 Civ. 4715, 2013 WL 6017444 (S.D.N.Y. Nov. 13, 2013).

There can be no dispute that the General Piar Charter was executed by a Venezuelan party in Venezuela, for a contemplated performance entirely within Venezuela, see, generally, Exhibit 1 to Paulsen Affidavit, so there can be no dispute Venezuelan law would apply to determine the issue of whether an enforceable agreement to arbitrate was created. See, Trans-Tec Asia, 518 F.3d, at 1124 (applying factors outlined in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and holding Malaysian law governed contract formation, regardless of contractual choice-of-law provision); Hutner v. Greene, 734 F.2d 896, 899 (2d Cir. 1984) ("[W]e of course apply the choice of law rules of the state in which the case was brought citing Klaxon Co. v. Stentor Electric Manufacturing Co. of North America, 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941), in this case New York. New York courts apply a 'paramount interest' test to choice of law issues involving contractual disputes. Under such a test, 'the law of the jurisdiction having the greatest interest in the litigation will be applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'") (quoting Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969), citing Miller v. Miller, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968)).

As the Restatement of U.S. Law of International Commercial Arbitration instructs, moreover, Section 188 of the Restatement Second, Conflict of Laws provides, a party's capacity to enter into the contract, too, must be resolved "*by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties*." RESTATEMENT OF THE U.S. LAW OF INTERNATIONAL

COMMERCIAL ARBITRATION, § 2-12, Reporters' Notes e.1. The relevant contacts to determine the most significant relationship include "*(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties*." Id.; see also, BV Bureau Wijsmuller v. United States of America, 1976 A.M.C. 2514 (S.D.N.Y. 1976). And, again, it is beyond cavil that most, if not all, of these contacts point towards Venezuela as the country with the most significant relationship to the transaction and the parties.

It thus especially behooves the Court to take a more meaningful look at the Venezuelan law so forcefully asserted by FMO, yet given such short shrift by the arbitrators.

### C.     UNDER VENEZUELAN LAW, NO VALID AGREEMENT TO ARBITRATE CAN BE RECOGNIZED.

FMO is a functionally decentralized entity operating as a State-owned company, the public nature of which public nature is an undisputed matter of record in the Final Award as well as in prior proceedings before this Court. Consequently, FMO's actions and its representatives must abide by the laws and the concept of legality applicable to iron mining activities and to Venezuelan State-owned entities and companies. The legal nature of FMO and therefore, its submission to Venezuelan public law mandates the satisfaction of requirements set by Venezuelan law for the conclusion and validity of an arbitration agreement. See, Canonico Declarations. As indicated, Venezuelan law acknowledges the possibility for state-owned companies to submit their disputes to arbitration, but conditions such submission to a stringent legal regime.

As Professor Canónico explained, for the arbitration agreement to be valid under Article 4 of the LAC, the relevant Minister had to duly authorize its execution in writing and the statutory organ of the State-owned company had to approve it, none of which happened, rendering the arbitration agreements void under Venezuelan law. See, Canonico Opinions, Exhibits A-C.

Under the Law on the Organic Statute for the Development of Guayana, moreover, the arbitration agreement is further considered invalid without the express authorization of the President of CVG, the supervisory organ of FMO, which also never happened, rendering the arbitration agreement void on this ground, as well. Id.

Finally, according to Articles 5 and 12 of the Organic Law on the Office of the Attorney General of the Republic, such arbitration agreements required the prior and express authorization from the Attorney General, which also never happened and further rendered the arbitration agreement null and avoid ab initio under Venezuelan law. Id.

As FMO averred over and over again before the Panel, none of the requirements of the three mandatory laws on state-owned companies' activity and contractual requirements were met with respect to the General Piar Charter. It is difficult to fathom what further proof could reasonably be mustered to prove this negative. Accordingly, there is no doubt that the arbitration agreements were invalid and not binding on the parties under Venezuelan law. Id.

Nor did CME ever proffer any United States court decision recognizing a principle of international arbitration preventing a state or a company or organization controlled by it which would have been a party to an arbitration agreement to later rely on the restrictive provisions of its own national law in order to renege on its otherwise valid

12

agreement to arbitrate. As in the United Sates, the Venezuelan Civil Code recognizes the general principle of <u>ignorantia iuris non excusat</u> (ignorance of the law does not excuse its breach). <u>Id.</u> Just as parties entering into contracts with state actors in the United States are charged with knowledge of, held to, the applicable rules and regulations concerning government contracts, so, too, should CME have been. Not only was CME no stranger to Venezuelan laws at the time the General Piar Charter was fixed, but there is no basis in employing this so-called principle of international arbitration to override the national law applicable to contract formation and capacity to sue.  <u>Id.</u> Though conveniently adopted by the Panel, it is little more than a canard, which this Court should correct.

**POINT II.          THE PANEL'S FINAL AWARD EXCEEDED THE SCOPE OF THE NEW YORK ARBITRATION PROVISION**.

Article V(1)(c) of the New York Convention permits a court to refuse to confirm an arbitral award when "the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of submission to arbitration." Again, since this presents an issue of arbitrability, it is presumptively reviewed by this Court <u>de novo</u>. <u>See</u>, <u>Sonera Holding B.V. v. Cukurova Holding A.S.</u>, 895 F. Supp. 2d 513, 521 (S.D.N.Y. 2012), rev'd on other grounds, 750 F.3d 221 (2d Cir. 2014) (whether award should be denied enforcement under Article V(1)(c) of New York Convention because the tribunal exceeded authority in awarding damages beyond those permitted by submission to arbitration is a "claim regarding the scope of arbitrability"); <u>Kristian v. Comcast Corp.</u>, 446 F.3d 25, 48 (1st Cir. 2006) ("damages limitation" in agreements "poses a question of arbitrability"). The presumption of *de novo* review can only be overcome if "the parties clearly and unmistakably provide otherwise." <u>Howsam</u>, 537 U.S. at 83 (quoting <u>AT&T Techs., Inc. v.</u>

13

Comms. Workers, 475 U.S. 643, 649 (1986)); see also, Rent-A-Center, 561 U.S., at 69 n.1 (2010) (the "'clear and unmistakable requirement' . . . pertains to the parties' manifestation of intent" (emphasis in original)); First Options, 514 U.S. at 944–45. Because this requires clear and unmistakable evidence of intent, courts do not balance competing sources of evidence. See, e.g., First Options, 514 U.S. at 944. Rather, any ambiguity as to intent "requires" courts "to assign questions of arbitrability to the district court." Katz, 290 F.3d 95, 97 (2d Cir. 2002).

The Federal Arbitration Act specifically only allows for arbitration of controversies "arising out of such contract." 9 U.S.C. § 2; and, of course, each contract of carriage necessarily represents a separate transaction. See, In re Rationis Enter's of Panama, 45 F. Supp. 2d 365, 367 (S.D.N.Y. 1999); Shipping Corp of India, Lts. V. Pan Am Seafood, Inc., 583 F. Supp. 1555, 1557 (S.D.N.Y. 1984); see also, Northeast Marine v. Master Morgan, No. 95 Civ. 1189, 1995 U.S. Dist. LEXIS 14688 (E.D. La. Oct. 5, 1995) (holding arbitration could not be compelled under one charter party because it was oral, but could be compelled under the other which was in writing, even though the claims were related and the parties the same); Coastal Shipping, Ltd. v. Southern Petroleum Tankers, Ltd., 812 F. Supp. 396 (S.D.N.Y. 1993) (holding arbitrators lacked even the power to consolidate arbitrations involving the same parties but under two separate charter parties).

And a creditor cannot allocate payment to a debt which is not actually owed. See, e.g., In re Mason, 573 B.R. 75, 80 (Bankr. S.D.N.Y, 2017) ("The foregoing authorities are inapplicable here, however, to KGG's claim as the debtor's oblige, because Ms. Mason did not owe 'multiple obligations" or 'more than one debt' to KGG as the foregoing cases require."); Lines v. Bank of Am. Nat'l Trust and Saving Ass'n, 743 F. Supp. 176, 181

14

(S.D.N.Y. 1990) ("It follows that since Occidental was not authorized or entitled to draw upon two sets of letters of credit, when it knew that the second set was a replacement for the first, Occidental's conduct constituted the kind of self-help that New York law does not permit because that concept, if construed too broadly, undermines the state's power to resolve disputes.").

"Under the well-settled law of payments, when a debtor owes multiple obligations to a creditor, and the debtor makes a payment, the debtor has the initial right to specify which obligation he wishes the payment to be applied to. In the absence of such a designation by the debtor, the creditor may specify which obligation to allocate the payment to. MTB Bank v. Federal Armored Express, Inc., 949 F. Supp. 226, 229 (S.D.N.Y. 1997) (citations omitted) ("If neither debtor nor creditor makes an allocation, then the court will do so as equity and justice require."); see also, Christiana Marine Serv. Corp. v. The Hercules, No. 90 Civ. 3963, 1990 U.S. Dist. LEXIS 12866, *12 (E.D. Pa. Sep. 8, 1990).

Where no selection is made by the debtor or creditor, courts have typically held that the debt "first in" would be payed as the "first out". See, generally, Home & City Savings Bank v. Bilinksi, 177 A.D.2d 73, 580 N.Y.S.2d 561 (3d Dep't 1992) ("While, under the circumstances herein, the application was placed in issue by defendants' contention in their reply papers that the $25,000 loan had been paid, it apparently was not perceived as such. Accordingly, the parties did not address and Supreme Court did not decide whether the application was in fact directed by 80 Micro or made by plaintiff (in the absence of a specific direction)."); Beyer Bros. of Long Island Corp. v. Kowalevich, 89 A.D.2d 1005, 454 N.Y.S.2d 444 (App. Div. 2d Dep't 1982) ("Where neither the

debtor nor the creditor makes such application, the court will make it as equity and justice require.").

FMO argued throughout that, having exercised its right to attribute its payments to the General Piar Charter in the first instance, CME's attempt to self-servingly attribute them to other contracts was contrary to law and could not properly serve as a basis for the jurisdiction of the arbitrators to funnel in claims for damages arising under the other contracts. See, CME's Second Amended Statement of Claim, Exhibit A to Keane Declaration, at ¶ 40; FMO's Answering Brief on Jurisdiction, Docket Entry No. 21-5.

The Final Award in question completely failed to address, let alone follow, the law on this issue. The clumsy finesse of relying on the "intertwined" nature of the contractual commitments can hardly be said to undermine their separate provisions. And FMO's clear legal right to select the debt to which its payments should be credited was completely overlooked. This was plain error on the law, which should find no ready sanction by the Court.

**POINT III.    THE PETITION SHOULD BE DENIED UNDER ARTICLE V(2)(b) OF THE NEW YORK CONVENTION.**

It is accepted principle that an arbitral award has no legal effect without the stamp of judicial approval of the judiciary.  Schlumberger Tech Corp. v. United States, 195 F.3d 216, 220 (5th Cir. 1999). The New York Convention acknowledges the right of the courts of each contracting state to "refuse" to lend its judiciary's imprimatur and coercive authority of the State to an arbitral award if it to do so would "be contrary to the public policy of that country", in this case the United States. Art. V(2)(B). Indeed, the United States' policy promoting arbitration relies on the understanding that "[h[aving permitted the arbitration to go forward, the national courts of the United States will have the

opportunity at the award-enforcement stage to ensure that the legitimate [public policy] interest … has been addressed*." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* 473 U.S. 614, 638 (1985).

An arbitration award is against public policy where it is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." TermoRio S.A.E.S.P. v. Electranra S.P., 487 F.3d 928, 938 (D.C. Cir. 2007). It is well established that the enforcement of a contract procured by bribery of a foreign public official is repugnant to fundamental notions of decency and justice in the United States, and thus, such a contract is not enforceable, whether by a U.S. court in the first instance in a breach of contract suit or by a U.S. court asked to recognize and enforce an arbitral award based on the claimed breach of such a contract. See, S.E.L. Maduro (Florida), Inc. v. M/V Santa Lucio, 116 F.R.D. 289, 297 (D. Mass 1987) ("In sum, it is beyond doubt that commercial bribery clearly contravenes a strong public policy and that the Court, in due administration of justice, cannot enforce a contract which is obtained by that means."); Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas, 314 F.Supp. 3d 95, 110 (D.D.C. 2018) (finding that petitioner "met its burden of demonstrating that confirmation of [a] … portion of the award would be contrary to U.S. public policy, and therefore … declin[ing]  to confirm th[at] portion of the award"). The Supreme Court has instructed that a court's refusal to enforce such an arbitral award be rooted in the fundamental common law notion "that no court will lend its aid to one who found a cause of action upon an immoral or illegal act." Misco, 484 U.S. at 42.

### A.   THE COURT SHOULD UNDERTAKE AN INDEPENDENT REVIEW OF THE RECORD.

The United States Supreme Court directs courts to substitute their own judgment for that of an arbitrator if the arbitration award, left unchanged, would violate public policy. See, W.R. Grace & Co. v. Local 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 766 (1983) ("[T]he question of public policy is ultimately one for resolution by the courts.")   In such instances, the reviewing court should resolve the issue by 'taking the facts as found by the arbitrator, but reviewing his conclusion de novo." E.I. DuPont de Nemours v. Graselli Emp. Ass'n, 790 F.2d 611, 617 (7th Cir. 1986).

### B.   THE COURT SHOULD FIND THAT THE GENERAL PIAR CHARTER PARTY WAS PART OF A CONTRACTUAL SCHEME WHICH WAS THE PRODUCT OF CORRUPTION.

CME procured all the agreements arising out of its alliance with FMO –including the General Piar Charter Party-  through a scheme to obtain millions of Dollars from FMO through illegal contracts. The corruption scheme involved CME executives and directors at the highest levels, including Mr. Tyrone Serrao.

The FMO officers involved in the scheme have each been criminally convicted in Venezuela for participation in the corruption scheme, which was part a far-reaching corruption scheme within FMO. The Venezuelan authorities have determined that as a result of this massive corruption scheme, which include CME's alliance with FMO, FMO was overcharged by millions of dollars. After discovering the corruption scheme in FMO, the Venezuelan police and judiciary vigorously investigated and prosecuted those linked to the scheme, resulting in the convection of several individuals and the indictment of CME's officers.

FMO's evidence in support of the corruption underlying the General Piar Charter party and its master agreement, the CAA, should have led the Panel to conclude that CME's engaged in a corruption scheme. This evidence includes:

- FMO submitted a witness statement from Mrs. Paula Maria Ziri-Castro Lopez, the prosecutor in charge of the FMO corruption investigation. (Exhibit B to Keane Declaration). In her witness statement Mrs. Ziri-Castro testified that on October 24, 2013, the criminal court in Venezuela where the prosecution of FMO's former officers took place, issued an arrest order against Mr. Serrao on the basis that there was sufficient evidence to presume his participation, as CME's agent, in the crimes of embezzlement, collusion of a public official with a contractor and collusion to commit a crime. Id. at ¶ 4. Mrs. Ziri-Castro submitted a second witness statement providing further information to the Panel on the status of the criminal prosecution of Mr. Serrao and testified twice as to the content of these witness statements. The testimony of Mrs. Ziri-Castro shows that the iron-for-services agreements entered into by FMO with entities like CME established numerous crimes under Venezuelan law.  See Exhibits B-E to Keane Declaration.

- On 21 July 2016, FMO's former president, Mr. Radwan Sabbagh pleaded guilty on the charges against him, including the charges of collusion with private contractors.  See, Exhibit B to Keane Declaration, at pp. 15-16; Exhibit F to Keane Declaration, at p.21.

CME was not only mentioned in the list of companies with which FMO had illicitly contracted but CME was also the object a criminal investigation in itself. Exhibit G to Keane Declaration, at pp. 255-258. The latter resulted in Mr. Tyrone Serrao, CME's chairman, being charged with immediate accessory to the crime of intentional embezzlement, collusion between a public Official and a Contractor and criminal association punished under Articles 52 of the Venezuelan Anti-Corruption Law  and  Article 83 of the Criminal Code, Article 70 of the Anti-Corruption Law and Article 37 of the Law against Organized Crime and Financing Terrorism, for the contracts he entered into with FMO. Exhibits H-I to Keane Declaration.

- Email dated September 3, 2010 from Tyrone Serrao to his lawyer Gerardo Vazquez, Esq. (Exhibit J to Keane Declaration). Ms. Lisa Sherriff, CME's comptroller and an individual by the name Clemente Silva were copied in the email. During the hearings, Tyrone Serrao conceded that the multi-million dollar payments described in the September 3, 2010 email directly related to the relationship between CME and FMO. See Exhibit K to Keane Declaration, at pp. 1128:25-1130:11. Significantly, Mr. Serrao's distribution of the amount discussed in the September 3, 2010 email left a 10% unaccounted for. During the hearing, Mr. Serrao could not explain the destination of this 10%. Id. at p. 1132:18-25.  Mr.

Serrao testified that Clemente Silva was a partner in the subcontractor that CME retained to operate the transfer station to which the M/V General Piar was attached to. Id. at pp. 1257:25-1258:24. In responding the Panel's interrogation, Mr. Serrao confessed that the above described payment was a "gift" from Mr. Silva representing several tens of millions of U.S. Dollars from funds paid by FMO to CME and then by CME to the subcontractor. Id. at p. 1264:6-14. Mr. Serrao, could not properly described the reasons for Mr. Silva to give a gift of such magnitude. However, Mr. Serrao did admit that he did not disclosed to FMO that he was receiving these paybacks from CME's subcontractor. All this evidence should have raised a red flag that CME's principal had accepted an unjustified and poorly explained multi-million dollar payment in exchange for granting the operation of the transfer station connected to the M/V General Piar to a subcontractor.

- During the hearings, CME was unable to explain its corporate structure, particularly whether Ms. Sherriff was a shareholder in the company. (Exhibit L to Keane Declaration). Furthermore, Mr. Serrao could not or would not reveal the identity of the beneficial owner of 80% of the stock of CME. (Exhibit K to Keane Declaration, at pp. 1158:4-1159:23. Neither Mr. Serrao nor Ms. Sherriff has been able to provide satisfactory responses as to who owned CME between 2009 and 2013. CME's witnesses were not

able to explain why there are contradictory documents showing Ms. Sherriff and her father as CME's shareholders at one point in time. Moreover, the Panel requested CME to provide a flow chart of CME dating back to five or six years. Id. at p. 1160:7-20. CME never provided such chart.

- Ms. Sherriff's testimony at the hearing indicated that CME is a sham company not following any corporate formalities. In this sense, Ms. Sherriff, CME's corporate secretary, showed complete lack of knowledge with respect to CME's corporate structure and affairs, or any corporate meetings or resolutions adopted by the shareholders or the board of directors. See, Exhibit M to Keane Declaration. CME's legal status should have raised alarm with the Panel as to how a company like CME could have received hundreds of millions of dollars from a state-owned company.

- Neither CME not Mr. Serrao had any experience in most of the services to be provided to FMO, including charter of vessels. (Exhibit L to Keane Declaration, at pp. 874:14-875:10).

- During the hearing, Mr. Serrao testified that CME did not present r bids in order to be awarded the General Piar Charter or any other of the contracts between CME and FMO. Id. at pp. 1254:22-1256:24.

- During the arbitration, CME disclosed that an entity with no relation with CME, PMS, entered into a contract with SMT Ship Management to assign all the services concerning the transfer station

to which the M/V General Piar was attached to. See Exhibit N to Keane Declaration. CME, however, could not explain why PMS and not CME, entered into the subcontract with SMT Ship Management and the reasons for such an enigmatic contractual arrangement.

- On July 25, 2018, a Venezuelan court annulled the two umbrella agreements –the Framework Agreement and the Commercial Alliance Agreement- pursuant to which the General Piar Charter was executed. (Exhibit T to Keane Declaration).

There can be no dispute that FMO submitted numerous evidence indicating that CME –at least probably- engaged in a corruption scheme to secure the CAA and all its underlying agreement, including the General Piar Charter.[2]  Faced with all this evidence, however, the Panel decided to do nothing, exclusively focusing on Mrs.Ziri-Castro's testimony that the Venezuelan prosecutors did not resolve whether Mr. Serrao had made a direct payment to FMO's officers. The  Panel's bias and lack of diligence against FMO's corruption allegations is highlighted by the Panel's decision to requests a $300,000 security deposit to cover FMO's request for production of documents from CME, where many of the requests were aimed at probing corruption allegations that FMO had red flagged.  While the Panel declined to conclude that CME had made a direct payment to a FMO's public officer, there is no question that the corruption scheme –whoever perpetrated it- produced the General Piar Charter  in contravention of established U.S. public policy. In addition, there is equally no question that CME was the direct

---

[2] On June 21, 2017, FMO filed a detailed memorandum concerning all the circumstantial evidence underlying the issues with how CME secured the different agreements with FMO.  (Exhibit O to Keane Declaration).

beneficiary of this corruption scheme.

### C.   ENFORCEMENT OF THE ARBITRAL AWARD WOULD BE CONTRARY TO UNITED STATES PUBLIC POLICY.

Recognition and enforcement of the Arbitral Award would therefore violate the clear U.S. public policy against enforcement of a contract procured by corruption.  The majority of U.S. states, including New York, reject enforcing illegal contracts. Moreover, bribery of foreign public officials and representative of a foreign political party (as the evidence suggest that what occurred here is a crime under the FCPA, and is a particularly pernicious form of bribery that undermines institutions and market-driven political economies at the very core of most basic U.S. public policy.) See, FCPA, 15 U.S.C. §§ 78dd-1, et seq. (prohibiting companies and their officers and agents from influencing foreign officials through bribery, direct or indirect).

The United States is also a signatory to the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, see, Exhibit P to Keane Declaration, at p. 1 ("[B]ribery is a widespread phenomenon in international business transactions, including trade and investment, which raises serious moral and political concerns, undermines good governance and economic development , and distorts international competitive conditions"); and the United Nations Convention Against Corruption, see, Exhibit Q to Keane Declaration, at p. iii ("Corruption is an insidious plague that has a wide range of corrosive effect on societies. It undermines democracy and the rule of law, leads to violations of human rights, distorts markets, erodes the quality of life and allows organized crime, terrorism and other threats to human security to flourish.").

Accordingly, although "[t]he public defense is to be construed narrowly," Karahas

<u>Bodas</u>, 364 F.3d at 306, the exceptional circumstances of this matter present a compelling case for application of that defense. The Final Award dealt with a corruption scheme in a manner that was at best both cursory and vague, simply finding that the public prosecutor in charge on the FMO criminal investigation did not testify that CME made a direct payment to any FMO official.   In the vast majority of cases involving alleged corruption, there is no admission or other direct proof of the crime, and an Panel must assess the allegations based on circumstantial evidence. This circumstantial evidence is frequently described as "indicia" or "red flags" of corruption. <u>See</u>, Carolyn B. Lamm, Hansel T. Pahm & Rahim Moloo, *Fraud and Corruption in International Arbitration*, Liber Amicorum Bernardo Cremades, p. 669 at 703 (2010) (here attached as Ex. R); Constantine Partisides, *How Should Tribunal Deal with Evidence of Corruption of an Investment or the Securing of Government Permits?*, 25 ICSID Review 1, ¶56 (2010) (here attached as Exhibit S). However, the Final Award fails to discuss any of the evidence of corruption with the exception of a reference to Mrs. Ziri-Castro's testimony only to conclude that she had not identified any CME-related direct payment to FMO officials. The Panel utterly disregarded Mrs. Ziri-Castro's detailed testimony as to how CME's conduct was indicative of corrupt intent under Venezuelan law. <u>See</u>, Exhibit C to Keane Declaration. The strong U.S. policy demands more and calls for this Court to decline to recognize and confirm the award in the face of substantial direct and circumstantial evidence that corruption was the reason CME was awarded all of its contract –including the General Piar Charter- with FMO.

The weight of evidence (discussed above) compels the conclusion that CME likely obtained the General Piar Charter through corruption. In fact, CME's principal,

Tyrone Serrao was indicted, together with several former FMO officials- for corruption. The Panel, like it was the case with most of the evidence submitted by FMO, failed to consider this evidence.

More fundamentally, even if there doubts about whether CME paid a bribery to a FMO officer, the barter scheme by which CME obtained the General Piar Charter was both criminally and administratively illegal under Venezuelan law. Indeed, several former FMO officers were criminally charged and convicted in Venezuela for those acts. Mr. Serrao himself was indicted for those acts. Regardless of the Final Award's uncertainty as to whether CME actually paid a bribe to a former FMO officer, the illegal scheme and acts resulted in CME's acquisition of the General Piar Charter. Therefore, this Court must refuse to recognize and enforce the Final Award, as to do would contrive a strong policy against corruption, and would require the Court to "lend its aid to one who found a cause of action upon and immoral and illegal act," Misco, 484 U.S. at 42.

In addition, the recognition and confirmation of the Final Award's conclusion that CME did not engage in corruption in its dealings with FMO, would itself violate U.S. public policy related to bribery. In particular, is clear that where (as here) there is evidence that a contract was obtained by bribery or corruption of a foreign public official, a U.S. cannot give legal effect to an arbitral award that upholds a contract while failing to resolve the question of whether bribery has occurred. See also, Grynberg v. BP, P.L.C., 527 F. App'x 278, 281 (5th Cir. 2013) (finding, with respect to a payment intended to bribe a public official, that "[t]he arbitrator's failure to determine the nature of the disputed payment warrants the vacatur of the [the Award]" (internal quotation omitted)).That is because giving legal effect to the corruption of foreign public official

violates U.S. public policy. Accordingly, the Panel simply did not have the discretion to give legal effect to a contract that was obtained by violating Venezuelan criminal and public procurement laws.

Finally, the Final Award did not address U.S. public policy, nor would this court owe any deference to the Final Award's resolution of U.S. public policy had it done so. Specifically, the Final Award based its determination of the corruption law on no ascertainable law, just its own personal views. However, the arbitrator's personal view, of course, does not determine the scope of U.S. public policy.

In sum, enforcement of the Final Award would result in a windfall to CME based on future services never rendered under contract procured by corruption in violation of U.S. public policy. FMO thus opposes recognition of the lion's share of the Final Award awarding CME  millions of dollars in future lost profits, which would require FMO to pay CME on a prospective basis amounts CME would have received if FMO had not terminated the General Piar Charter  that was invalidly obtained by corruption.

## CONCLUSION.

WHEREFORE, FMO urges the Court to deny CME's motion and grant to FMO such

other and further relief as this Honorable Court may deem just and proper.

Dated:          New York, New York
                September 30, 2020

                              Respectfully submitted,

                              MAHONEY & KEANE, LLP
                              Attorneys for Petitioner

                    By:       s/ Garth S. Wolfson                    __
                              Garth S. Wolfson /
                              Edward A. Keane
                              61 Broadway, Suite 905
                              New York, New York 10006
                              (212) 385-1422

                                   -and-

                              Daniel E. Vielleville
                              ASSOULINE & BERLOWE
                              100 SE 2nd St., #3105
                              Miami, Florida 33131
                              (905) 567-5576